ASSOCIATED GENERAL CONTRAC-
TORS OF MASSACHUSETTS,
INC., et al.

v.

Alan ALTSHULER, as he is Secretary of
the Executive office of Transportation
and Construction, and Walter J. Poi-
trast, as he is Director of the Bureau of
Building Construction.

United Community Construction Workers
and Michael Williams, Intervenors
Defendants.

Civ. A. No. 72–3410.

United States District Court,
D. Massachusetts.

May 31, 1973.

James J. O'Leary, Boston, Mass., James E. Flynn, Jr., Cambridge, Mass., for plaintiff.

Dennis L. Ditelberg, Asst. Atty. Gen., Boston, Mass., for defendants.

Gershon M. Ratner, Boston Legal Assistance Project, Robert D. City, Boston, Mass., Benjamin Jones, Boston Legal Assistance Project, Gene R. Shreve, Boston Legal Assistance Project, Roxbury, Mass., for United Community Construction Workers and Michael Williams, intervenors defendants.

## OPINION

FREEDMAN, District Judge.

*Introduction:*

This matter was commenced before the Court on November 7, 1972 by virture of plaintiffs' complaint requesting permanent injunctive relief against the defendants from soliciting bids or proposals in connection with the construction of a library, cafeteria, auditorium and classrooms for use by Boston State College, or in connection with any other public building construction contract

which may include § 1B of the contract drafted by the Commonwealth for the Boston State College project. Plaintiffs also seek a declaration that § 1B of that contract is both unconstitutional and inconsistent with existing Massachusetts law for the following reasons: (1) it imposes on the contractor securing the bid for said contract obligations to have minimum minority manhour quotas without regard to qualifications and other requirements inconsistent with obligations under federal bid conditions and the federal equal employment opportunity clause found in all federally assisted construction programs, and therefore violates the Supremacy Clause in Article VI of the Constitution of the United States; [1] (2) it requires the contractor to hire fixed minimum minority manhour quotas in each job category without regard to qualifications and hence violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States, as well as Articles I, X and XII of the Declaration of Rights of the Constitution of Massachusetts; (3) it permits the imposition of sanctions upon the contractor without affording him notice and the opportunity to be heard and/or defend himself with the use of witnesses and making a record for review in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States and Articles X and XII of the Declaration of Rights of the Constitution of Massachusetts; [2] (4) it vests in the Massachusetts Commission Against Discrimination (hereinafter called MCAD) the power to summons records in connection with the employment practices of the contractors involved, and allows the imposition of sanctions without any specific finding by MCAD of an unlawful practice, and is thus in direct conflict with M.G.L. c. 15B and Articles X, XII, and XXX of the Declaration

of Rights of the Massachusetts Constitution; [3] and (5) it requires bidders to agree to assess a backcharge of $\frac{1}{10}$ of 1% of the filed subcontract award price against a noncomplying subcontractor in contravention of the Massachusetts Payments Statute (M.G.L. c. 30 § 39F). [4]

The United Community Construction Workers, Inc. (a Massachusetts charitable corporation existing as a labor union representing workers in the construction trades and as an employment referral center for unemployed minority construction trades workers) and one Michael Williams (an unemployed black sheet rock worker and a member of United Community Construction Workers, Inc.) were allowed to intervene as defendants in this case on November 29, 1972. On December 15, 1972, the Court denied plaintiffs' motion for a temporary restraining order, and at the same time, denied defendants' motion to dismiss. It was also acknowledged at this time that the matter before the Court would not proceed further on temporary injunctive relief, but would proceed on the permanent injunction and the substantive legal challenges to § 1B of the Boston State College Contract. On January 5, 1973 plaintiffs' motion for protective order, seeking to prevent the taking of some 23 depositions of various trade union officials in the City of Boston, was denied by the Court. At that time, plaintiffs were given leave to file additional evidentiary materials after defendants' final discovery materials were filed. Plaintiffs' further motion to strike portions of affidavits already filed by the defendants was denied. Defendants' latest affidavits of the 23 various labor unions previously mentioned were ordered filed by January 15, 1973.

*Procedural Posture:*

The question was raised during argument as to what procedural posture the

---

1. See Appendix A, § 1B–.03.1.

2. See Appendix A, § 1B–.11 in its entirety, and Appendix B, paragraph B amending § 1B–.11.

3. See Appendix A, § 1B–.11.1, 1B–.11.2 and Appendix B, paragraph B amending § 1B–.11.2.

4. See Appendix A, § 1B–.11.2(a).

Court was taking with regard to determining the issues raised in the case. The parties were unclear whether the case was proceeding under Rule 65(a)(2) of the Federal Rules of Civil Procedure—i. e., by the Court considering an advancement of the trial on the merits and a consolidation with the hearing on the motion of an application for a preliminary injunction, (although it was agreed the application for a preliminary injunction would be bypassed) or whether the case was proceeding under Rule 56 of the Federal Rules of Civil Procedure as a motion for summary judgment (although neither party had ever, in fact, filed a motion for summary judgment). This was clarified by the Court when it asserted that it was proceeding with the case as a civil non-jury case and would consider all evidence submitted for purposes of deciding the controversy as to the legality of § 1B of the Boston State Contract. On February 9, 1973 the plaintiffs and original defendants, Altshuler and Poitrast, filed a written stipulation in which they agreed that both parties had completed all evidence they wished to submit to the Court, that neither sought further opportunity to introduce evidence whether by testimony, deposition or affidavit, and that the case was ripe for the Court to make a determination on the merits. The stipulation was approved by the Court on February 15, 1973. On that day, defendant-intervenors filed a statement with the Court asserting that they had submitted all the evidence they wished to submit against plaintiffs' position and, on the question of law at hand, there was no need for further evidence, and that the case was ripe for judgment at this time.

The parties, therefore, being in basic agreement as to the procedural status of the case, the Court moves along to consider the issues presented, and for that purpose submits its basic findings of fact and conclusions of law pertaining thereto.

*Findings of Fact:*

1. Plaintiff, Associate General Contractors of Massachusetts, Inc., is a Massachusetts corporation organized under the provisions of M.G.L. c. 180, with its usual place of business in Brookline, Massachusetts (hereinafter called the "Association").

2. Said plaintiff Association is a membership corporation comprised of 145 general contracting firms which together perform approximately eighty (80) percent of all commercial, industrial and public building construction in Massachusetts.

3. Plaintiffs, E. C. Blanchard Co., Conti and Donahue, Inc., James Farina Corporation, Franchi Construction Co., Inc., Granger Bros., Inc., Loranger Construction Corporation, F. W. Madigan Company, Inc., Gerald E. McNally Construction Co., Inc., Northgate Construction Company, Inc., Park Construction Co., Inc., Vappi & Company, Inc., S. Volpe & Co., Inc. and Westcott Construction Corporation (hereinafter called the "Contractors") are Massachusetts corporations, each of which maintains its usual place of business in Massachusetts. All of the plaintiff contractors are members of the plaintiff association.

4. The defendant, Alan Altshuler, is the Secretary of the Executive Office of Transportation and Construction of the Commonwealth of Massachusetts (hereinafter called the "Secretary") and had properly been appointed to such position in compliance with state law (M.G.L. c. 6A § 3).

5. The defendant, Walter J. Poitrast, is the Director of the Bureau of Building Construction within the Executive Office of Transportation and Construction of the Commonwealth of Massachusetts (hereinafter called the "Director").

6. The United Community Construction Workers, Inc. is a Massachusetts charitable corporation engaged in the business of a labor union representing minority construction trades workers and acts as an employment referral cen-

ter for placing unemployed workers in the construction trades (hereinafter called "defendant-intervenors").

7. Michael Williams is an unemployed black sheet rock worker and is a member of the United Community Construction Workers, Inc. (hereinafter also called "defendant-intervenor").

8. One of the defendant Director's duties by state law (M.G.L. c. 6A § 24) is to solicit sealed bids ("or proposals") by newspaper advertisements and other means for all public building construction projects in accordance with § 22 of aforementioned Chapter 6A. After the bid solicitation process is completed, the Director with the approval of the Secretary is required to award contracts for said projects to the lowest responsible eligible bidder in accordance with the procedures outlined in said § 24 as well as Chapter 149 §§ 44A to L, inclusive.

9. Besides approving contract awards by the Director, the Secretary is also charged by § 20 of Chapter 6A with the ultimate responsibility of the exercise of all powers and the performance of all duties assigned by law to the Bureau of Building Construction and to its Director.

10. On or about October 13, 1972, the Director, pursuant to instructions of the Secretary, caused an advertisement to be printed in the Boston Globe and other newspapers inviting contractors to bid in connection with the proposed Boston State College Classroom, Library, Audi-

torium and Cafeteria Building Contract (hereinafter called "the Boston State Contract")—said authority for seeking bids for said contract properly lying within the provisions of Chapter 6A § 24.

11. The times originally set forth in said notice for the filing of general bids (November 17, 1972) and sub-bids (November 10, 1972) were later extended by the Director.

12. The prospective construction cost of the Boston State Contract is expected to be in the range of $12,000,000 to $15,000,000.

13. The Secretary and Director included § 1B as an integral part of the bid specifications to the Boston State Contract; so that by submitting a bid, each bidder would be deemed to have agreed to comply with the provisions of § 1B, if he was awarded the Boston State Contract.

14. Section 1B contains provisions allegedly designed to obtain equal employment opportunities for minorities.

15. On May 30, 1972, the Executive Office of Transportation and Construction of Massachusetts issued a position paper as to the history of the Boston Plan, a plan to bring about more minority employment in construction trades, and the effect that the Office's new policy would have on public contracts in the near future.[5]

16. Each of the plaintiff Contractors are general contractors and historically have been active in the field of construction.

---

5. "Boston Plan I" was an agreement on the part of representatives of construction labor unions, contractors, and minority community representatives, instituting a five-year program for integrating the construction labor force in the Boston area. Projected targets and goals to be reached were established. The U.S. Department of Labor funded the plan. Apparently, the plan was not progressing satisfactorily, and the Department of Labor withheld second-year funding until a revised plan was negotiated. The new plan, "Boston Plan II", commenced operation in January 1972, and has been endorsed and funded by the U.S. Depart-

ment of Labor. The plan involves only two parties—the contractor and the labor unions. There was no participation in Boston Plan II by state or local public officials or by minority community representatives.

Apparently, the Commonwealth's Office of Transportation and Construction was not satisfied with Boston Plan II and did not have a great deal of faith in its achieving effective results. In its position paper of May 30, 1972, it delineated its new policy, much of which is embodied in § 1B of the Boston State Contract. Boston Plan II is still in effect.

17. Prior to the publication of the advertisement or notice to bid referred to in No. 10, representatives of the Association, including the Contractors, met with the Secretary and his representatives on several occasions to discuss § 1B's draft contract language and took the position at that time that the plaintiffs regarded its provisions as illegal.

18. Following said meetings, the defendants caused bid specifications to be issued for the Boston State Contract which contained § 1B's language as identical in relevant respects to the draft contract language mentioned in the position paper. [See No. 15.]

19. Section 1B contains a severability clause, added to the contract by Addendum No. 2, dated November 15, 1972. [See Appendix B.]

20. Plaintiff Contractors are currently performing one hundred, fifty-five million dollars ($155,000,000) worth of public building contracts in Massachusetts within M.G.L. c. 6A § 22, and in the past have performed billions of dollars worth of such contracts.

21. The Federal Equal Employment Opportunity Clause is a mandatory provision in all federally assisted construction contracts.

22. Besides the Federal Equal Employment Opportunity Clause, the Secretary of Labor of the United States Department of Labor (hereinafter called "the Secretary of Labor"), pursuant to § 201 of Executive Order No. 11246 (30 F.R. 12319), as amended, and 41 C.F.R. 60, has promulgated so-called Bid Conditions to be included in all bid documents for federally assisted construction contracts.

23. The aforementioned federal equal employment opportunity clause and Bid Conditions set forth affirmative action and equal employment opportunity requirements designed to bring about increased minority employment in federally assisted construction contracts. In order to be considered a responsive bidder and eligible to be awarded such a contract, all bidders must agree with both the federal equal employment opportunity clause and the Bid Conditions as promulgated by the Secretary of Labor.

24. The Boston State Contract originally has been regarded as a federally assisted construction contract and therefore is subject to the aforementioned Federal Equal Employment Opportunity Clause and Bid Conditions. Such clause and conditions do appear in the bid specifications for the Boston State Contract.

25. Based on information revealed in the depositions of several union officials, and on other statistical evidence available, the Court concludes that racial imbalance does exist in the Boston Construction Trades and such imbalance is the result of past discriminatory practices on the part of many entities of that industry. The "Equal Employment Opportunity Local Union Report EEO-2" forms are most instructive. These forms must be filed annually with the federal government by any local union whose membership exceeds one hundred. The union is required to provide statistical information comparing the number of minority group members, referrals, and applicants, with the total numbers in each of those categories. The Court has studied EEO-2 forms for the years 1968–72 filed by several construction trade unions servicing the City of Boston and has found that the vast majority of the unions have been and remain racially imbalanced.[6]

In 1968 the statistics show that twelve unions had a minority membership of approximately 3–4% or less, and three had minority memberships of 5%, 9%, and 15%, respectively. In 1969 thirteen unions reported a minority membership of 3–4% or less, two report-

---

6. It should be noted that many of these unions serve areas well outside the City of Boston, including areas in other New England states. The total membership figures and separate minority membership figures include these outside areas, many of which admittedly may not have a sizable minority population.

ed 5%, two reported 10%, and two laborers' unions reported 15% and 18%, respectively. The situation continues in 1970 and 1971 with similar statistics, showing only slight change by 1972 when the total minority membership of 21 unions was approximately 7%. It should be noted that this figure would be significantly lower but for the relatively high minority percentage figures of two laborers' unions.

■ Boston has a sizable minority population. According to data compiled from 1970 census figures, the total minority population may exceed 23%. In the Roxbury section of Boston the minority population exceeds 60%. It should be obvious to anyone who looks at them, that a comparison of the union membership statistics and the census population statistics, clearly supports a finding of racial imbalance in the trade unions servicing the Boston area. More importantly, however, this Court adopts the previously established practice of accepting such statistics as sufficient evidence to support an inference of racial discrimination and holds that such inference has not been overcome by any contrary evidence. See Carter v. Gallagher, 452 F.2d 315, 323 (8th Cir. 1971); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970); Turner v. Fouche, 396 U.S. 346, 360, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970).

■ The fact that the statistics are based on union membership figures does not prohibit their application to the construction trades as a whole. It is commonly known (and supported by affidavits in this case) that the majority of construction companies get their workers through union hall referrals. As a result, the companies become instrumental in the perpetuation of a racially discriminatory system of hiring in that industry. Plaintiffs here may argue that there is no evidence to prove that the individual construction companies named as plaintiffs use this method to get workers. No matter. Affirmative action plans, including a provision such as § 1B, are not designed to punish previous wrongdoers. They seek to exact a "covenant for present performance" which will hopefully have the effect of abolishing the results of past discriminations in the construction industry regardless of who was at fault in the past. See Contractors Ass'n. of Eastern Pa. v. Secretary of Labor, 442 F.2d 159, 176 (3rd Cir. 1971).

26. The Commonwealth of Massachusetts attempted to divest itself of receiving any federal funds for the Boston State Contract, but the federal government declined to agree to such a request pending the results of this litigation. Therefore, the Boston State Contract continues to be regarded as a federally assisted construction contract.

From these findings of fact, the Court proceeds to examine the legal questions raised in plaintiffs' complaint and makes its conclusions of law as to whether § 1B is constitutional or not on its face and, as a result, can or cannot be validly enforced.

*Conclusions of Law:*

I  *Violation of Supremacy Clause*

Plaintiffs allege that § 1B violates Article VI of the United States Constitution (Supremacy Clause). They argue that, when compared with the federal provisions authorized by Executive Order No. 11246, as amended by Order No. 11375, the § 1B contractual commitments conflict with the federal provisions and require bidders to agree to requirements not included in the federal provisions.

In order to reach its determination of this issue, the Court reviews the leading cases of Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1940), and Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). In *Hines*, the Court was confronted with an alleged conflict between the Pennsylvania Alien Registration Act of 1939 and The Federal Alien Registration Act of

1940. The Court ultimately held that the federal act formed a comprehensive, integrated scheme for the regulation of aliens and precluded the enforcement of state alien registration acts such as that adopted by Pennsylvania. In so holding, the Court had to make a determination of "whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (312 U.S. at p. 67, 61 S.Ct. at p. 404). This language is instructive in two respects. *First*, the Court uses the language "in this particular case" indicating these matters must be decided on a case by case basis. [The Court makes this clearer at p. 67, 61 S.Ct. at p. 404 by stating, "There is not . . . any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress."] *Second*, it indicates there must be an inquiry into Congressional purpose and objective and a comparision with the state law purpose and objective. In making such a comparison in *Hines*, Justice Black stated at pp. 66–67, 61 S. Ct. at p. 404 ". . . where the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation . . . states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, *or enforce additional or auxiliary regulations*." [Emphasis added.] At first blush, this is strong, confining language. However,—"inconsistently with the purpose of Congress"— seems to be somewhat of a qualifying phrase indicating that in some cases where the state and federal purpose are the same, certain inconsistencies between state and federal law will not necessarily render the state law invalid. It should be noted that *Hines* offers no absolute test. The Court states at p. 67, 61 S.Ct. at p. 404 that there is no "infallible constitutional test or an exclusive constitutional yardstick."

■ *Perez* interpreted *Hines* as establishing a controlling principle that "any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause" (402 U.S. p. 652, 91 S.Ct. p. 1712). In *Perez*, the Court was deciding whether a state statute protecting judgment creditors from "financially irresponsible persons" was in conflict with a federal statute that gave discharged debtors a new start "unhampered by the pressure and discouragement of pre-existing debt." The Court noted initially that its ultimate determination would be the result of a two-step process of first ascertaining the purpose of the two statutes and secondly determining whether they do in fact conflict. *Perez* is clearly looking to *Hines* as a controlling case which establishes the "controlling principles" and points out the "primary functions of the Court in Supremacy cases." There is a third step in the process, however. After establishing the "purposes" of the state and federal laws respectively and after determining whether such purposes are in conflict, it must also be determined whether the federal authority intended to make its jurisdiction exclusive—i. e., whether it has "pre-empted" the field. [See California v. Zook, 336 U.S. 725 at 731, 69 S.Ct. 841, 93 L.Ed. 1005 (1949).]

■ In examining the facts of the case at bar, the Court finds that Executive Order No. 11246, 30 F.R. 12319 (Sept. 28, 1965), provides for the inclusions in government contracts of provisions aimed at preventing discrimination by government contractors. It is clearly stated in Order No. 11246 that the policy of the federal government is to provide equal job opportunity in all federal employment or federally funded projects, for all qualified persons, and to prohibit discrimination in employment because of race, creed, color or national origin, and to promote the realization of equal employment opportunity through a positive, continuing program. Order No. 11246 "carries forward" such a program.

[See Executive Order No. 11375, 32 F.R. 14303 (Oct. 17, 1967), extending 11246 to prohibit sex discrimination.]

In the Governor's Code of Fair Practices, Executive Order No. 74, Governor Sargent declared in Article I that:

"Non-discrimination and equal employment opportunity are the policy of the Executive Department of the Commonwealth of Massachusetts in all of its decisions, programs and activities. To that end, all state employees shall rigorously take affirmative action steps to insure equality of opportunity in the internal affairs of state government, as well as in their relations with the public, including those persons and organizations doing business with the Commonwealth."

The Order further states that affirmative action:

". . . must also entail positive and aggressive measures to insure equal opportunity in the areas of hiring, promotion, demotion or transfer, recruitment, layoff or termination, rate of compensation, and inservice apprenticeship training programs."

As in the Federal Executive Order, the Governor's Order makes provision for anti-discrimination clauses in state contracts for public buildings, etc. The Secretary of the Executive Office of Transportation and Construction (defendant Altshuler) has determined that § 1B is a proper contract clause, authorized by the Governor's Order, to "carry forward" the policy of that order, and has included and will include it in all future public building construction contracts in urban areas containing substantial minority residential concentrations.

Upon examination, it seems quite clear to this Court that the purpose of § 1B, in light of the Governor's Order, and the purpose of the provisions of Executive Order No. 11246, in light of the policy of the federal government, are the same: that is, to require equal opportunity in hiring, etc. on state and federally supported projects, respectively. They cannot be said to be in conflict with one another, at least to the extent that the policy and purpose are the same.

The Supreme Court has reached the same conclusion in a similar case. In Colorado Anti-Discrimination Commission et al. v. Continental Air Lines, Inc., 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963), the appellant issued an order against the respondent alleging unfair employment practices under The Colorado Anti-Discrimination Act of 1957. Respondent argued that the state commission should be prevented from taking such action inasmuch as the federal government had pre-empted the field. They asserted that the state action was invalid under the Supremacy Clause. To support this position, respondent argued that the Federal Aviation Act of 1958, The Railway Labor Act, and certain executive orders, had pervasively covered the field. By Executive Order No. 10925 of March 6, 1961, President Kennedy established the President's Committee on Equal Employment Opportunity. The Order stated that discrimination based on race, etc. is contrary to constitutional principles and policies of the United States, that it is the obligation of the government to ensure equal opportunity for all qualified persons, and that it is the policy of the executive branch to encourage by positive measures equal opportunity. In carrying out the "positive measures" policy, the Order required certain provisions in government contracts aimed at preventing discrimination by the contractors and encouraging, by positive action, equal opportunity. The Court concluded by stating, at p. 725, 83 S.Ct. at p. 1027:

"Finally, we reject the argument that Colorado's Anti-Discrimination Act cannot constitutionally be enforced because of Executive Orders requiring government contracting agencies to include in their contracts clauses by which contractors agree not to discriminate against employees or applicants because of their race, religion, color or national origin."

The Court did not directly address itself to the general question of whether an Executive Order can foreclose state legislation. It did state, however:

"It is impossible for us to believe that the Executive intended for its orders to regulate air carrier discrimination among employees so pervasively as to preempt state legislation intended to accomplish the same purpose."

The Executive Order involved in *Colorado* had nearly the same relationship to the Colorado statute as Order No. 11246 has to § 1B, and the Supreme Court's analysis and conclusion in that case seem most applicable to the present case.

Having determined that there is no inherent conflict of policy and purpose between § 1B and federal regulations and provisions, it remains to be considered whether or not the federal government has intended to "pre-empt the field" and assume exclusive control over matters of employment discrimination on projects which are partially funded by the federal government. This Court thinks not. The federal provisions included in the Boston State Contract were made pursuant to the directive of Executive Order No. 11246. We are not dealing then with an alleged conflict between state action and congressional action as would be the case if we were concerned directly with the Civil Rights Act. However, it is important for our purposes to recognize that in enacting the Civil Rights Act (which, among other things, prohibits employment discrimination), Congress expressly stated that it was not their intent to interfere with existing or future state law. [See 42 U.S.C. § 2000e–7, § 2000h–4.] The Court interprets this as evidence of a general federal policy not to interfere with state law which is consistent with federal policy in civil rights matters. This should include Executive Orders as the Supreme Court concluded by inference in Colorado Anti-Discrimination et al. v. Continental Air Lines, Inc., *supra*.

In Contractors Ass'n of Eastern Pa. v. Secretary of Labor, 442 F.2d 159 (3rd Cir. 1971), the constitutionality of Order No. 11246 was unsuccessfully challenged. The Court stated at pp. 171, 172:

"But while Congress has not prohibited Presidential action in the area of fair employment on federal or federally assisted contracts, the Executive is bound by the express prohibitions of Title VII." [The Civil Rights Act of 1964]

It is fair to conclude that the Executive is also bound by the express provisions of the Act disclaiming any intent to interfere with state law which is not inconsistent with the policy of the Act. In any event, there is nothing within Order No. 11246 itself or within the history of Executive Orders in general to indicate that the Executive intended its Order to preclude any state action in the same field.

In Florida Lime & Avocado Growers, Inc., et al. v. Paul, Director of the Department of Agriculture of California et al., 373 U.S. 132, 83 S.Ct. 1210, 10 L. Ed.2d 248 (1963), the Supreme Court considered the validity of a California statute which conflicted with a federal regulation concerning the marketability of avocadoes. In upholding the California regulation, the Court (at p. 142, 83 S.Ct. at p. 1217) applied a test of "whether both regulations can be enforced without impairing the federal superintendence of the field." The Court further stated that " . . . federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." The Court found there was no "inevitable collision" between the California and federal scheme despite the dissimilarity in standards. The California standards were more demanding than the federal. It is not unusual for the Court to allow states to set higher standards than the minimum federal standards. [See p.

144, 83 S.Ct. 1210.] In the instant case, provision 1B does not act to impede "federal superintendence" of the field despite the fact that § 1B is more demanding in its affirmative action requirements. All federal requirements may still be met.

In conclusion, this Court finds that § 1B is compatible with the federal executive order, and hence, does not fail because of the Supremacy Clause.

## II   *Unconstitutional Quota*

Plaintiffs argue § 1B constitutes a fixed racial quota which violates the Due Process and Equal Protection Clauses of the United States Constitution and Articles I, X, and XII of the Declaration of Rights of the Massachusetts Constitution. The particular section (1B–.03.1) which plaintiffs are challenging requires that the contractor " . . . shall maintain a not less than twenty percent ratio of minority employee manhours to total employee manhours in each job category."

Plaintiffs are correct in asserting that classification by race is something which has traditionally been forbidden by the Constitution. There is a wealth of case law to support such a position. The Constitution protects all races from unfair classification or discrimination on the basis of race—white as well as all others. Indeed, the major objection to most affirmative action employment plans has been that they unlawfully discriminate against whites. Unfortunately, our country's history is replete with examples of racial classification and "quotas." They seem to have been effectively used in the past to promote and maintain policies of racial, religious, and other forms of discrimination, all diabolically insidious to the American dream of equal opportunity. Inequality of citizenship has been the result. It was a long time before there was any official awareness expressed over the drastic effects of unconstitutional discriminatory practices. In the landmark decision of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court recognized the harmful effects of discrimination on children forced to attend racially . segregated schools. *Brown* seemed to usher in an era of judicial determinations recognizing that the Constitution could not tolerate discrimination of any kind, whether it be intentional or otherwise. Proscribing discriminatory conduct is not enough, however. The more difficult task is to correct the effects of what has been done in the past and see that it does not occur again. Courts have been addressing themselves to these problems recently, and there is a rather substantial body of case law to which this Court may look for guidance in making its determination. Many of these cases have allowed, and some have ordered, affirmative action plans which embody preferential treatment for minorities and classification by race. In Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920 (2nd Cir. 1968), at p. 931, the Court stated,

> "What we have said may require classification by race. That is something which the Constitution usually forbids, not because it is inevitably an impermissible classification, but because it is one which usually, to our national shame, has been drawn for the purpose of maintaining racial inequality. Where it is drawn for the purpose of achieving equality it will be allowed, and to the extent it is necessary to avoid unequal treatment by race, it will be required."

The Court is willing to agree with plaintiffs that § 1B requires preferential treatment for minorities and establishes classifications based on race. It may even require a "quota." The term used is not important. What the Court must decide is whether or not such requirements are allowable in the circumstances of this case.

In favor of their position that fixed racial quotas are illegal, even if remedial in character, plaintiffs look to Mapp v. Board of Education, 1972, 6th Cir., 477

F.2d 851. The Court of Appeals there reversed a desegregation plan which provided for a "racial ratio of not less than 30% nor more than 70% of any race in each elementary school within the system." The Court characterized the plan as a "fixed racial quota." There seemed to be much concern over the fact that busing would be required to effect the necessary percentages. The *Mapp* Court was forced to acknowledge, however, that while not "commanded" by Swann v. Board of Education, 402 U.S. 1, 91 S. Ct. 1267, 28 L.Ed.2d 554 (1971), racially fixed quotas were *permitted* in that case. *Swann* was a school desegregation case wherein the Supreme Court approved "the very limited use made of mathematical ratios" as being within the "equitable remedial discretion of the District Court." *Mapp* does not appear to be very helpful.[7] Admittedly, it is difficult to interpret *Swann* in light of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In reference to the Civil Rights Act, the *Griggs* Court stated at pp. 430, 431, 91 S.Ct. at p. 853:

".  .  . the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed."

Of course, neither *Swann* nor the case at bar deal directly with the Civil Rights Act. Nonetheless, it seems that many of the lower courts believe *Swann* tempered *Griggs* somewhat. See Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971), on rehearing in 1972, at p. 331; United States v. Lathers, CCA 2d Cir., No. 72–1345 (Jan. 2, 1973).

*Lathers* was an action brought by the United States under the Civil Rights Act of 1964 to enjoin a pattern and practice of discrimination by a labor union in work referrals. The District Court ordered issuance of 100 work permits immediately to minority applicants. In answer to the contention that such preferential treatment was proscribed by the Act, (42 U.S.C. § 2000e–2(j)) the Circuit Court stated:

"The only limitation on the broad powers of affirmative relief is that restricting preferential quota hiring. However, *while quotas merely to attain racial balance are forbidden, quotas to correct past discriminatory practices are not.*" [Emphasis added.]

The Court drew support from a number of cases which had allowed or ordered preferential treatment. See Joyce v. McCrane, 320 F.Supp. 1284 (D.N.J. 1970). United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir. 1971), cert. den., 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); United States v. International Bro. of Elec. Wkrs., L. No. 38, 428 F.2d 144 (6th Cir. 1970); Local 53 of Int. Ass'n of Heat & Frost I. & A. Wkrs. v. Vogler, 407 F.2d 1047 (5th Cir. 1969); United States v. Central Motor Lines, Inc., 325 F.Supp. 478 (W.D.N.C. 1970). Plaintiff may argue *Lathers* and the cases cited therein are distinguishable from this case. The Court would have to agree. They all deal with the Civil Rights Act and alleged violations thereunder. Many of them deal with specific instances of discrimination and grant relief to specific aggrieved parties. None of them require specific hiring ratios on specific job sites but seem to be aimed at industry-wide practices within the communities involved. Despite these differences, one must conclude that in determining whether or not these remedial schemes were allowable under the Civil Rights Act, the Courts must have considered the more basic question of their constitutionality. From the wide use and approval

---

7. This Court is careful to note the caution of *Swann*, 402 U.S. on p. 22, 91 S.Ct. on p. 1279:
   "It would not serve the important objective of *Brown I* to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination."

of the various plans, some of which included ratio hiring, etc., the inference must be drawn that the courts felt they passed constitutional muster.

The Court need not rely only on the bare inference of constitutionality the Civil Rights Act cases raise, however. There are a number of cases which have dealt more specifically with the constitutionality of various affirmative action plans. In Contractors Ass'n of Eastern Pa. v. Secretary of Labor, *supra,* the Third Circuit almost summarily dismissed the argument that the "Philadelphia Plan" required "racial quotas" prohibited by the equal protection aspect of the Fifth Amendment. At 442 F.2d 177, the Court stated:

"The Philadelphia Plan is valid Executive action designed to remedy the perceived evil that minority tradesmen have not been included in the labor pool available for the performance of construction projects in which the federal government has a cost and performance interest. The Fifth Amendment does not prohibit such action." [8]

Certainly a holding that such a plan does not violate equal protection is instructive for our purposes even though it was a Fifth Amendment question involved.

In Southern Illinois Builders Association v. Ogilvie, 327 F.Supp. 1154 (S.D. Ill.1971), the Court approved a plan designed to remedy the effects of discrimination on highway construction projects in two Illinois counties. The Court determined that under-representation of minorities on the projects was the result of the fact that equal employment opportunities in construction unions did not exist for the minority groups in this two-county area. Most contractors obtained their workers from union referrals. The "Ogilvie Plan" basically provided for the recruitment, training and placement of minority group residents of the two-county area. The Plan was incorporated into all bids for construction and reconstruction of highways in the area involved. In order to be in compliance, the contractors who signed the plan were required to hire trainees at the minimum ratio of one trainee for every four journeymen. Speaking generally, the Court stated at p. 1159:

". . . in circumstances where blacks have been discriminated against for years, there is no alternative but to require that certain minorities be taken into consideration with respect to the specific minority percentage of the population in a given area in order to provide a starting point for equal employment opportunities. In this regard, it is the feeling of this Court that minimum ratios, where, *de jure* or *de facto,* based upon race are constitutional and valid when adopted for the purpose of implementing affirmative action to achieve equal employment opportunities."

The Court further stated at p. 1161:

"The contractors may find themselves in a rather unfortunate position, but unless prohibited by statute the Government has the unrestricted power to determine with whom it will deal and the terms and conditions of its contracts."

This language could apply equally as well in the case at bar. In light of the *Contractors* case (Philadelphia Plan) and others, the Court found "little difficulty in approving the Ogilvie Plan." [9]

---

8. The "Philadelphia Plan" related to minority hiring on federally assisted construction projects in a 5-county area and included as a pre-condition to federal assistance the bidders' submission of an affirmative program enlisting goals within the range specified for minority hiring. No bidder would be awarded a contract unless his affirmative action program included goals falling within the established range.

9. In an amended order, the Court made it clear that the intent of the plan was to guarantee craft-wide representation in highway construction in the aggregate in the two-county area and did not require referral employment of minority group in-

The most recent and probably the leading case in this Circuit is Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972). Plaintiffs in that case, six blacks and two of Spanish descent, claimed violations of the Civil Rights Act, 42 U.S.C. §§ 1981, 1983, in police recruiting and hiring practices in Boston. The District Court found no racial discrimination had occurred, but did hold that the written exam was non-predictive and discriminatory and ordered a new exam be given which would be more job related. In declining to grant preferential hiring for minorities, the District Court stated at 334 F.Supp. 930, 949 (D.Mass.1972):

".  .  . it is a fallacy to suppose that the Constitution entitles blacks to police selected like jurors as representatives of a cross-section of the community. Blacks have no more a constitutional right to a quota of black policemen than a quota of black judges or legislators, or state-employed teachers. What blacks and other minorities have a right to is that public employees like policemen shall be selected by criteria that are significantly related to a job.'"

The Circuit Court disagreed in part with the court below and ruled the judge had erred in refusing to recognize the case as one involving racial discrimination and felt the relief ordered by the lower court was ".  .  . unlikely to increase significantly this level of [minority] representation." [See 459 F.2d 730.] The Court further indicated that it felt compensatory treatment was called for and that additional remedial measures were necessary. The following order was made:

1. A new exam be made available to all applicants.

2. Those Black and Spanish candidates who failed the 1968–70 exam and passed the new one and qualified otherwise, be placed in a priority pool.

3. A second pool be created containing those then on eligibility lists followed by those who pass the new exam.

4. Certification be made from the two pools according to some ratio —i. e., one from the priority pool for every one, two, or three from the second pool until the priority pool is exhausted.

The Circuit Court did not fix the precise formula to be used, believing that to be a matter for remand. At p. 737, the Court stated:

"We believe that the preferential status for the priority pool will yield a significant increment of black and Spanish-surnamed police officers in the near term. *We have therefore refrained from couching our guidelines in terms of percentage representation,* which would have entailed resort to assumptions as to relevant areas and populations, and within these, the numbers and proportions of black and Spanish-surnamed persons disposed to seek police work." [Emphasis added.]

This language seems to indicate that the Circuit Court would not hesitate to order or approve "percentage representation" if it deemed it necessary to effect the desired result.

■ It may be argued that none of the plans involved in the cases cited are as demanding as § 1B. Certainly the cases are distinguishable in a number of respects. However, the language has often been strong and positive that plans similar to § 1B are permissible where there is evidence of past discrimination. This Court has found that racial imbal-

---

dividuals in a fixed ratio on any particular job site. This was a clarification of the Court's original interpretation of the plan and its subsequent approval. It did not indicate how the Court would have found had the plan required fixed ratio

hiring on particular job sites. From the strong language in the original opinion, however, it does not appear it would have made any difference in the Court's ultimate decision.

ance does exist in the Boston area construction trades and that such imbalance is the result of past racial discrimination. As a result of such findings the Court holds that the provision of § 1B requiring contractors to maintain a minimum 20% minority work force in each job category does not violate the Constitution of the United States, but stands as a proper attempt to remedy the present effects of past discrimination.

Plaintiffs argue that they will be forced to hire unqualified workers and that they will be required to comply with § 1B or suffer sanctions whether or not they exercise good faith. Lest there be any doubt, the Court interprets the contract to require that only "qualified" workers be hired. This includes any hiring of minority workers in compliance with the requirements of § 1B. Defendant Altshuler has sworn by affidavit that he so interprets the contract, and he is bound by that representation. This means that employment based on qualification or merit has not been eliminated by § 1B and it is with this understanding that this section has been so construed by the Court.

Plaintiff also claims § 1B violates the Massachusetts Constitution. The reasoning used in holding § 1B not violative of the United States Constitution can be applied to the Massachusetts Constitution as well. The only Massachusetts case which seems to be at all relevant is of little help. In Trustees v. Volpe Construction Co., 358 Mass. 331, 264 N.E.2d 676 (1970), defendant had contracted to construct a building for plaintiff which was being partially funded by the federal government. The contract proscribed any racial discrimination by defendant in its hiring policies and required the defendant to take affirmative action to insure that employment practices were carried on without regard to race. [The Supreme Judicial Court treated the case as one involving a contract issue and did not even reach the merits in its final determination.] Defendant argued plaintiff was demanding a quota system.

The Court did make clear what it was *not* holding at pages 682 and 683:

"We do not hold that the number of 'Negroes and Puerto Ricans' employed by the defendant must constitute twenty per cent of the defendant's work force on the project nor do we hold that the University has any right to impose a 'quota' system on the defendant."

The most distinguishing characteristic of this case as opposed to other cases cited above is that there was no allegation of discriminatory policies in the bill. Having found this to be the closest case on point, I find that the Supreme Judicial Court has not determined conclusively whether "ratio hiring" or "quotas" are violative of the Massachusetts Constitution when used to remedy the present effects of past discrimination. This Court now holds that § 1B does not violate any provision of that Constitution.

### III  Due Process

Plaintiffs further allege that § 1B violates Due Process because it permits the imposition of sanctions without benefit of notice of the alleged breach or opportunity to be heard. It is the Court's opinion that the amendments contained in Addendum No. 2 to § 1B make this question moot. The Bureau can make a determination to impose sanctions only after a full administrative hearing pursuant to M.G.L. c. 30A §§ 10, 11. Nor is the fact that the contractor has the burden of showing he made every possible effort to comply so unfair that it violates procedural due process. As defendants point out, the contractor is the one with ready access to records, etc.

### IV  Massachusetts  General  Laws, Chapter 151B

Plaintiff argues that § 1B contravenes the legislative scheme established by M. G.L. c. 151B to deal with employment discrimination and that the MCAD does not have the necessary legislative autho-

rization to act in the capacity proposed by § 1B–.11.2. These are questions of state law. For convenience sake and because these matters are so closely related to the other issues of this action, this Court will exercise its discretion under the doctrine of pendent jurisdiction and decide these issues applying Massachusetts law.

M.G.L. c. 151B § 4(9) specifically proscribes the commission from requiring preferential treatment because of racial imbalance:

> "Nothing contained in this chapter or in any rule or regulation issued by the commission shall be interpreted as requiring any employer . . . to grant preferential treatment to any individual or to any group because of the race, color . . . because of imbalance which may exist between the total number or percentage of persons employed by any employer . . . and the total number or percentage of persons of such race, color . . . in the commonwealth or in any community, section or other area therein, or in the available work force in the commonwealth or in any of its political subdivisions."

There seems to be no Massachusetts case law interpreting this section. Plaintiff cites cases holding that a state agency may promulgate rules and regulations, but that such rules and regulations must fall within the ambit of the enabling statute. Defendant cites authority for the proposition that when a general power is given all authority necessary to carry it out is inferred by implication. It is the opinion of this Court that an interpretation of c. 151B § 4(9) is not necessary as that section is not applicable here, for the following reasons.

Section 4(9) seems to forbid the MCAD from making any "rule" or "regulation" requiring preferential treatment. Under the § 1B–.11.2 scheme, the commission has no "rule making" or "regulatory" powers. The commission investigates alleged noncompliance and

reports a finding of such to the bureau with a recommendation of sanctions. Such conduct is within their authority. Section 2 of c. 151B provides:

> "The commission, as established by section fifty-six of chapter six, shall formulate policies to effectuate the purposes of this chapter *and may make recommendations to agencies and officers* of the commonwealth or its political subdivisions in aid of such policies and purposes." [Emphasis added.]

Section 9 of c. 151B provides that the provisions of the chapter shall be construed liberally for the accomplishment of the purposes thereof. Construing § 2 liberally, the Court finds the MCAD does have the authority to act pursuant to the relevant provisions of § 1B and upon examination of those provisions finds the commission's duties thereunder are not proscribed by § 4(9) of c. 151B.

Plaintiff argues that c. 151B itself is incorporated into the plan through § 1B–.08. This is so. However, nothing in § 1B is made under the authority of c. 151B. Section 4(9) of that chapter prohibits interpretations of preferential treatment from anything "contained in this chapter . . . ." The authority for § 1B comes from nothing "contained" in c. 151B but from Executive Order No. 74 and the authority to accept and rejects bids given to defendant Poitrast by c. 6A § 24 and c. 149 § 44A et seq. Defendants have so stated in their briefs and this Court agrees.

V   *Massachusetts "Payment Statute"*

Plaintiffs' final argument is that § 1B unlawfully contravenes M.G.L. c. 30 § 39F (Payments Statute), since § 1B requires bidders to agree to assess a backcharge against a non-complying subcontractor. Defendant argues that the Payments Statute is not germane because it deals with the payment of amounts due for satisfactory compliance with the contract, while § 1B contemplates a backcharge only where its provi-

sions have not been satisfactorily complied with. This is another question of state law over which the Court will assert its pendent jurisdiction.

Section 1B–.11.2(a) provides as a possible sanction for non-compliance the following:

> "the recovery by the Bureau from the General Contractor of $\frac{1}{100}$ of 1% of the contract award price in the nature of liquidated damages or, if a filed Subcontractor is in non-compliance, the recovery by the Bureau from the General Contractor, to be assessed by the General Contractor as a backcharge against the Subcontractor, of $\frac{1}{10}$ of 1% of the filed subcontract award price, in the nature of liquidated damages, for each week that such party fails or refuses to comply."

M.G.L. c. 30 § 39F(a) & (b) provides for prompt payment to a subcontractor by the general contractor after the general contractor receives either periodic or final payments from the awarding authority. However, the general contractor is authorized to withhold "any amount claimed due from the subcontractor by the general contractor." Such withholding would certainly seem to be in the nature of a "backcharge" as contemplated by § 1B–.11.2(a). Subcontractors are deemed to have agreed to the terms of the contract [See § 1B–.02.], and are thus bound by the provisions therein, including § 1B–.11.2(a). If they are found to be in non-compliance, the contractor may certainly consider the "backcharge" an "amount claimed due from the subcontractor" under the contract. It does not appear to this Court then, that the § 1B provision contravenes the Massachusetts law in any respect as it does in fact comport with § 39F(a) & (b).

In consideration of the foregoing, this Court holds that § 1B's intention to bring about equal employment opportunities for minorities is constitutional in all aspects, and consequently, plaintiffs' request for injunctive and declaratory relief is denied.

## APPENDIX A

### B

### SECTION 1B

### EQUAL EMPLOYMENT OPPORTUNITY ANTI-DISCRIMINATION AND AFFIRMATIVE ACTION

1B–.01 For purposes of this contract, "minority" refers to Orientals, Blacks, Puerto Ricans and North American-Indians. "Commission" refers to the Massachusetts Commission Against Discrimination.

1B–.02 During the performance of this contract, the Contractor and all of (his) Subcontractors (hereinafter collectively referred to as the Contractor), for himself, his assignees, and successors in interest, agrees as follows:

   .1 In connection with the performance of work under this contract, the Contractor shall not discriminate against any employee or applicant for employment because of race, color, religious creed, national origin, age, or sex. The aforesaid provision shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment advertising; recruitment; layoff; termination; rates of pay or other forms of compensation; conditions or privileges of employment; and selection for apprenticeship. The Contractor shall post hereafter in conspicuous places, available for employees and applicants for employment, notices to be provided by the Commission setting forth the provisions of the Fair Employment Practices Law

of the Commonwealth (M. G.L. Chapter 151B).

.2 In connection with the performance of work under this Contract, the Contractor shall undertake in good faith affirmative action measures designed to eliminate any discriminatory barriers in the terms and conditions of employment on the grounds of race, color, religious creed, national origin, age or sex, and to eliminate and remedy any effects of such discrimination in the past. Such affirmative action shall entail positive and aggressive measures to ensure equal opportunity in the areas of hiring, upgrading, demotion or transfer, recruitment, layoff or termination, rate of compensation, and in-service or apprenticeship training programs. This affirmative action shall include all action required to guarantee equal employment opportunity for all persons, regardless of race, color, religious creed, national origin, age, or sex. A purpose of this provision is to ensure to the fullest extent possible an adequate supply of skilled tradesmen for this and future Commonwealth building projects.

1B–.03 .1 As part of his obligations of remedial action under the foregoing section, the contractor shall maintain on this project, which is located in an area in which there are high concentrations of minority group persons, a not less than twenty per cent ratio of minority employee man hours to total employee man hours in each job category, including, but not limited to, those "classes of work" enumerated in section 44c of chapter 149 of the Massachusetts General Laws.

.2 In the hiring of minority journeymen, apprentices, trainees and advanced trainees, the Contractor shall rely on referrals from the Boston Area Construction Program, traditional referral methods utilized by the construction industry, and referrals from agencies, not more than three in number at any one time, designated by the Liaison Committee.

1B–.04 .1 There shall be established for the life of this contract a body to be known as the Liaison Committee. The Liaison Committee shall be composed of one representative each from the Bureau, the Commission, Boston State College, the Boston State Coalition, the Black Student Association of Boston State College, and the Contractors' Association of Boston, Inc.

.2 The Contractor (or his agent, if any, designated by him as the on-site equal employment opportunity officer) shall recognize the Liaison Committee as an affirmative action body, and shall establish a continuing working relationship with the Liaison Committee, consulting with the Liaison Committee on all matters related to minority recruitment, referral, employment, and training.

.3 The Contractor shall prepare projected manning tables on a quarterly basis.

These shall be broken down into projections, by week, of workers required in each trade. Copies shall be furnished one week in advance of the commencement of the period covered, and also when updated, to the Commission and to the Liaison Committee.

.4 Records of employment referral orders, prepared by the Contractor on forms furnished by the Commission, shall be made available to the Commission and to the Liaison Committee on request.

.5 The Contractor shall prepare weekly reports on forms furnished by the Commission of hours worked in each trade by each employee, identified as minority or non-minority. Copies of these shall be provided at the end of each such week to the Commission and to the Liaison Committee.

1B–.05 The Contractor shall take affirmative action to involve qualified minority subcontractors in lieu of non-filed sub-bids. This affirmative action shall cover both pre-bid and post-bid periods. It shall include notification to the Office of Minority Business Assistance (within the Secretariat of Communities and Development) or its designee, while bids are in preparation, of all products, work or services for which the Contractor intends to negotiate bids. Minority Subcontractors are encouraged to estimate their work specialty and make their prices known to prospective general contractors during the bidding stages.

1B–.06 In the employment of journeymen, apprentices, trainees and advanced trainees, the Contractor shall give preference, first, to citizens of the Commonwealth who have served in the armed forces of the United States in time of war and have been honorably discharged therefrom or released from active duty therein, and who are qualified to perform the work to which the employment relates, and, secondly, to citizens of the Commonwealth generally, and, if such cannot be obtained in sufficient numbers, then to citizens of the United States.

1B–.07 A designee of the Commission and a designee of the Laison Committee shall each have right of access to the construction site.

1B–.08 *Compliance with Requirements*
The Contractor will comply with the provisions of the Governor's Code of Fair Practices, dated July 20, 1970, and of Chapter 151B, as amended, of the Massachusetts General Laws, both of which are herein incorporated by reference and made a part of this contract.

1B–.09 *Non-Discrimination*
The Contractor, in the performance of all work after award, and prior to completion of the contract work, will not discriminate on grounds of race, color, religious creed, national origin, age or sex in employment practices, in the selection or retention of subcontractors, or in the procurement of materials and rentals of equipment.

1B–.10 *Solicitations for Sub-Contracts, and for the Procurement of Materials and Equipment*
In all solicitations either by competitive bidding or negotiation made by the Contractor ei-

ther for work to be performed under a subcontract or for the procurement of materials or equipment, each potential subcontractor or supplier shall be notified in writing by the Contractor of the Contractor's obligations under this contract relative to non-discrimination and affirmative action.

1B–.11 *Compliance of Information Reports and Sanctions*

.1 The Contractor will provide all information and reports required by the Bureau or the Commission on instructions issued by either of them and will permit access to its facilities and any books, records, accounts and other sources of information which may be determined by the Commission to affect the employment of personnel. This provision shall apply only to information pertinent to this Section 1B. Where information required is in the exclusive possession of another who fails or refuses to furnish this information, the Contractor shall so certify to the Bureau or the Commission as appropriate and shall set forth what efforts he has made to obtain the information.

.2 Whenever the Bureau, the Commission, or the Liaison Committee believes the General Contractor or any Subcontractor may not be operating in compliance with the terms of this Section 1C, the Commission shall conduct an appropriate investigation, and may confer with the parties, to determine if such Contractor is operating in compliance with the terms of this Section 1C. If the Commission finds the General Contractor or any Subcontractor not in compliance, it shall make a preliminary report of non-compliance, and notify such Contractor in writing of such steps as will in the judgment of the Commission bring such Contractor into compliance. In the event that such Contractor fails or refuses to fully perform such steps, the Commission shall make a final report of non-compliance, and recommend to the Bureau the imposition of one or more of the sanctions listed below. If, however, the Commission believes the General Contractor or any Subcontractor has taken or is taking every possible measure to achieve compliance, it shall not make a final report of non-compliance. Within fourteen days of the receipt of the recommendations of the Commission, the Bureau shall impose one or more of the following sanctions, as it may deem appropriate to attain full and effective enforcement:

(a) the recovery by the Bureau from the General Contractor of $1/100$ of 1% of the contract award price in the nature of liquidated damages or, if a filed Subcontractor is in noncompliance, the recovery by the Bureau from the General Contractor, to be assessed by the General Contractor as a backcharge against the Subcontractor, of $1/10$ of 1% of the filed subcontract award price, in the nature of liquidated damages, for each week that such party fails or refuses to comply;

(b) the suspension of any payment or part thereof due under the contract until such time as the General Contractor or any Subcontractor is able to demonstrate his compliance with the terms of the contract;

(c) the termination, or cancellation, of the contract, in whole or in part, unless the General Contractor or any Subcontractor is able to demonstrate within a specified time his compliance with the terms of the contract;

(d) the denial to the General Contractor or any Subcontractor of the right to participate in any future contracts awarded by the Bureau for a period of up to three years.

.3 If at any time after the imposition of one or more of the above sanctions a Contractor is able to demonstrate that he is in compliance with this Section 1B, he may request the Bureau, in consultation with the Commission, to suspend the sanctions conditionally, pending a final determination by the Commission as to whether the Contractor is in compliance. Upon final determination of the Commission, shall either lift the sanctions or reimpose them.

APPENDIX B

THE COMMONWEALTH OF MASSACHUSETTS

EXECUTIVE OFFICE OF TRANSPORTATION AND CONSTRUCTION

BUREAU OF BUILDING CONSTRUCTION

DIVISION OF STATE COLLEGES

Massachusetts State Project No. E65–4

Contract No. 1

Federal Designation Project No. Mass. 4–1–00638–0

Classroom, Library, Auditorium and Cafeteria Building Boston State College, Boston, Massachusetts

ADDENDUM NO. 2

November 15, 1972

The attention of bidders submitting proposals for Mass. State Project No. E65–4, Contract No. 1, Boston State College, is called to the following addendum to the Contract Form, Specifications and Drawings. The items set forth herein, whether of omission, addition, substitution or clarification are to be included in and form a part of the proposal submitted.

THE NUMBER OF THIS ADDENDUM (NO. 2), MUST BE ENTERED IN SPACE B PROVIDED AFTER THE WORD "NUMBERED" ON PAGE 4 OF THE CONTRACT FORM ENTITLED "FORM FOR GENERAL BID" AND IN PARAGRAPH B ON SUB-BID FORM BBC 18.

A. CONTRACT FORM CHANGE

ATTENTION GENERAL BIDDERS:

After page 7 of the contract form insert new pages 7A, 7B, 7C and 7D which becomes a part of the contract form. These pages must be completed and submitted with the bid documents.

ATTENTION FILED SUB BIDDER:

All filed sub bidders shall as a condition of bid, *complete* and *attach* to their filed sub bid form pages 7A, 7B, 7C and 7D which are transmitted as part of addenda # 2.

Attention is directed to pages 7B, 7C and 7D which will require signatures.

B. SPECIFICATION CHANGES

Section IB–.11.2, fifth sentence: after the word "shall," insert the words: "move to".

IB–.11.4–"Action taken by the Bureau under sections 1B–.11.2 or 1B–.11.3 shall be an adjudicatory proceeding as that term is used in M.G.L. c. 30A, and shall comply with M.G.L. c. 30A

**1314**

§§ 10, 11. No investigation by the Commission shall be initiated without prior notice to the Contractor."

Section 1B–.12.1 SEVERABILITY.
—The provisions of this Section 1B are severable, and if any of these provisions shall be held unconstitutional by any court of competent jurisdiction, the decision of such court shall not effect or impair any of the remaining provisions."