**BOSTON CHAPTER, NAACP, INC., et al.**

**v.**

**Nancy B. BEECHER et al.**

**UNITED STATES of America**

**v.**

**CITY OF BOSTON et al.**

Civ. A. Nos. 72-3060-F, 73-269-F.

United States District Court,
D. Massachusetts.

Feb. 8, 1974.

As Amended Feb. 11, 1974.

Patrick J. King, Thomas A. Mela, Boston, Mass., Benjamin Jones, Roxbury, Mass., for plaintiff in Civ. A. No. 72–3060–F.

James M. Fallon, Dept. of Justice, Civil Rights Div., Employment Sec., Washington, D. C., Raymond Picard, Asst. U. S. Atty., Boston, Mass., for plaintiff in Civ. A. No. 73–269–F.

Edward D. Kalman, Walter Mayo III, John F. McGarry, Asst. Atty. Gen., Thomas F. McKenna, Asst. Corp. Counsel, Boston, Mass., for defendants.

FREEDMAN, District Judge.

These cases allege discriminatory practices on the part of the defendants in their qualification requirements and overall hiring policies for the position of firefighter in the City of Boston, in particular, and in other cities and towns of the Commonwealth of Massachusetts subject to state Civil Service law. Because of the identity of the issues involved and relief sought, the two cases were consolidated by the Court with the assent of the parties. United States v. City of Boston et al. is brought by the Attorney General to enforce the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended by the Equal Employment Opportunity Act of 1972, (Pub.L. 92–261, March 24, 1972), and pursuant to 42 U.S.C. §§ 1981, 1983 for alleged deprivations of constitutionally protected rights. The plaintiff United States alleges discriminatory practices against blacks and Spanish-surnamed persons in recruitment policies, in the utilization of non-job predictive tests and qualifications which have a detrimental impact on

blacks and Spanish-surnamed persons, and in the refusal to remedy those practices and correct the present effects of past racially discriminatory policies and practices. Plaintiff prays that the defendants be enjoined from continuing these alleged policies and ordered to conduct a meaningful minority recruitment program and to hire sufficient blacks and Spanish-surnamed persons to overcome the effects of alleged past discrimination. The Attorney General also seeks monetary compensation for the loss suffered by those minority persons who were denied employment opportunity because of the alleged discriminatory practices.

Boston Chapter, NAACP, Inc., et al. v. Beecher et al. is brought as a class action. The cause of action is said to arise pursuant to 42 U.S.C. §§ 1981, 1983 and 28 U.S.C. §§ 2201, 2202. Plaintiffs allege discrimination in defendants' policies of recruiting and in their use of allegedly discriminatory selection procedures including the written exam, the swim test, and use of police records. The relief requested is similar to that prayed for in the companion case, including the imposition of a one to one hiring ratio and attorneys' fees.

### Certification of a Class

Pursuant to F.R.Civ.P. 23(c)(1), the Court has ordered that Civil Action No. 72–3060–F be maintained as a class action. The following classes have been certified:

(1) All black or Spanish-surnamed persons who have applied for the position of firefighter in any fire department in the Commonwealth of Massachusetts subject to Massachusetts Civil Service law, but have not become eligible for appointment under existing requirements.

(2) All black or Spanish-surnamed persons who have never applied for the position of firefighter because they have allegedly been deprived of information concerning firefighter employment opportunities as a result of the allegedly discriminatory recruitment practices of the defendants.

Class (2) is represented by plaintiff Howard. Class (1) is represented by all other named plaintiffs.

### Procedural Posture

Evidence was heard on plaintiffs' request for preliminary relief including evidence on defendants' overall recruiting and testing practices on July 30, 1973 and September 11–17, 1973. It was agreed by the parties that the hearing for preliminary relief would be treated as a trial on the merits, pursuant to Rule 65(a)(2), as to the written examination only. The issue of recruitment remained at the preliminary injunction stage. The issues of the swim test requirement and use of police records were not raised at this posture.

Partly as the result of a self-imposed freeze and partly on instructions from the Court, the Massachusetts Division of Civil Service (MDCS) has not certified for appointment individuals from the currently existing Civil Service eligible list for the fire service in Boston, Springfield, Worcester, Cambridge, or New Bedford, since the commencement of these actions. By order of the Court, however, MDCS was allowed to certify twenty (20) individuals for the fire service in Boston after the Court determined that an emergency situation existed in that city.

### Present Hiring Procedure

The following facts have been stipulated to by the parties.

Nancy B. Beecher, Joseph M. Duffy, Richard J. Healey, Wayne Budd, and Helen C. Mitchell are the members of the Massachusetts Civil Service Commission and they are charged with the setting of policy for the Division of Civil Service. From January 22, 1968 to April 5, 1973, Mabel A. Campbell was Director of Civil Service and responsible for the administration and operation of

the Division of Civil Service, including administering written examinations, medical examinations, strength requirements, and determining the good moral character of all persons seeking employment in the fire services in all cities (39) and in 68 towns in Massachusetts, including Boston. In addition, Ms. Campbell established eligibility lists and certified eligible individuals to those fire departments.

The Director of Civil Service, upon request of a city or town, establishes education requirements pursuant to the provisions of M.G.L. c. 31 § 6A. Approximately 15 fire departments, not including the Boston Fire Department, require applicants to have a high school diploma or an equivalency certificate issued by the Massachusetts Department of Education. All other fire departments, including Boston, have no education requirements. The Director of Civil Service has been required by state law (M.G.L. c. 31 § 2A(m)) to establish a recruitment program to recruit persons to fill vacancies for officers and positions in the classified civil service, including firefighters, since March 1968. The responsibility of the Director of Civil Service to establish or conduct a recruitment program is subject to and dependent upon receiving sufficient funds for recruitment purposes through appropriations of the Massachusetts legislature. William McRell has been acting Director of the Division of Civil Service from April 5, 1973 to date.

The present Civil Service eligibility requirements for applicants for the position of firefighter in all cities (39) and 68 towns of the Commonwealth are as follows:

a) age 19 to 35 years of age;

b) no height requirements;

c) no weight requirements;

d) good moral character;

e) high school diploma or equivalency certificate required when requested by a city or town; and

f) average physical requirements.[1]

The written examination for firefighter for all cities and towns in Massachusetts, including Boston, contain two parts. The first section is composed of 25 questions of a general intelligence nature. Each answer in Section I is worth 1 point. The second section contains 75 questions which are taken from the "Red Book." Each answer in Section II is worth 1 point. This type of examination has been given for at least the last twenty years. Of the 25 questions in the general intelligence section of the written examination there are approximately six questions from each of the four areas of arithmetic, spelling, vocabulary, and general knowledge, and an occasional question on current events or civics. The "Red Book" is a Fire Manual for the Instruction of Applicants for Entrance Examinations in the Fire Service in cities and towns of the Commonwealth of Massachusetts, prepared by the Massachusetts Division of Civil Service. This book has been in circulation for at least 20 years. The latest publication of the manual was March 3, 1972.

Applicants who achieve a passing score of 70 of the written examination, referred to above, are then evaluated for their prior training and experience and rated on a scale of 70 to 100. The final score for each candidate is a composite of 70% of the written examination score and 30% of the training and experience score. But one must achieve a passing score of 70 on the written examination to have his training and experience evaluated. Those applicants who have a total composite score of both the written

1. Pursuant to Massachusetts state law certain cities and towns, including Boston, have residency requirements for firefighter service. There is some uncertainty as to the present effectiveness of such requirements in the Commonwealth as of this date. However, this Court notes that the Massachusetts Superior Court has recently overruled an opinion of the Attorney General for the Commonwealth and has determined that such requirements do exist, are valid, and must be followed.

examination and the training and experience over 70, must then pass a medical examination, meet certain strength requirements and the good moral character requirement. There are no points awarded nor is the total composite score affected in any way by these requirements; however, if a candidate does not meet any of these three requirements, he is not eligible for certification. Applicants who pass the written examination and fail any other requirement may pass those requirements anytime during the life of the eligibility list and have their name placed on said list. The final composite score is expressed to the second decimal place, i.e., "84.26." Disabled veterans are then placed on the list (100 down to 70), followed by veterans (100 down to 70), who are then followed by non-veterans (100 down to 70). Within six months of the date of the written examination, the Division of Civil Service establishes an eligibility list, and that list exists for a maximum of 2 years, at which time it expires by operation of state law, or the list expires by virtue of its exhaustion within that period of time. Every firefighter eligibility list for Boston prior to the current one, which was established in April 1972, has expired by virtue of its exhaustion.

In August 1971, the Division of Civil Service administered a statewide firefighter entrance examination, and with the approval of the Massachusetts Commission Against Discrimination, all applicants taking the examination were given the option of identifying their race, color or national origin. A three-page computer compilation of the results of the racial classification of applicants taking that examination revealed that 84% (3181/3790) of all applicants responded to one or more categories of the information requested, relative to race, color or national origin. On the current eligibility list for Boston, established on April 4, 1972, following the written examination of August 1971, there are presently more than 236 individuals; in addition approximately 98 have already been appointed.

■ The City of Boston is a municipal corporation incorporated pursuant to the laws of the Commonwealth of Massachusetts and is a political subdivision of Massachusetts. The City of Boston is an employer within the meaning of 42 U.S.C. § 2000e(b), as amended. The City of Boston maintains and operates a fire department for the prevention and suppression of fires within its city limits. James D. Kelly is the Commissioner of the Boston Fire Department. In that capacity, he is responsible for the administration and operation of the Boston Fire Department including filling firefighter positions and assigning firemen within the department. Applicants to the Boston Fire Department currently must meet the following requirements:

a) age 19 to 35 years of age; [Prior to 1971 the minimum age was 21.]

b) no height or weight requirements;

c) good moral character;

d) no specific education requirements; and

e) average physical requirements.

In order to become eligible for appointment to the Boston Fire Department, an applicant must meet the requirements as administered by the Massachusetts Division of Civil Service.

Each of the four Boston firefighter eligibility lists established as a result of the examinations administered in August 1968, September 1969, January 1970, and September 1970 has expired, and each list was exhausted by the appointment of every individual on the list willing to accept appointment except for two or three candidates. Since January 1, 1969, Commissioner Kelly, appointing authority of the Boston Fire Department, has hired 454 individuals. Persons appointed to firefighter positions in the Boston Fire Department are required to complete a training program of approximately eight weeks at the Boston Fire Academy. Failure to satisfactorily complete that program is

ground for terminating a trainee's employment. Persons appointed to the firefighter position in the Boston Fire Department serve a probationary period of six months in accordance with Massachusetts Civil Service law. Performance which is not satisfactory to the appointing authority is ground for terminating a probationary firefighter's employment, in accordance with Civil Service law.

### Burden of Proof

■ It is generally accepted that where racial discrimination in employment selection procedures is alleged, the plaintiff must first establish a prima facie case of discrimination. If that is established, the burden shifts to the defendant to justify the challenged procedures. The duty of the Court in such cases has been outlined by the Court of Appeals for this Circuit in Castro v. Beecher, 459 F.2d 725 (1st Cir., 1972). That case involved similar issues relating to hiring procedures for the police departments in the Commonwealth. At page 732, the Court stated:

"In the general course, a court faced with a claimed denial of equal protection must first ascertain whether the plaintiff has made such a threshold showing as to require a justification, must then identify the classification employed, and must finally determine whether the classification has been justified under governing standards."

In determining whether a plaintiff has made a "threshold showing" of discrimination, this judge has previously accepted statistical evidence of racial imbalance as sufficient to establish such a showing, or, to put it otherwise, as sufficient to establish a prima facie case of past racial discrimination. See Associated General Contractors of Massachusetts, Inc. v. Altshuler, 361 F.Supp. 1293, 1299 (D.Mass., 1973); aff'd 490 F.2d 9, (1 Cir., 1973), p. 18, fn. 15, and cases cited therein. In that case, a significant disparity between the minority population percentage in the City of Boston and the percentage of minorities employed in the construction trades in the Boston area was found to be sufficient to establish a prima facie case of racial discrimination on the part of the construction industry. In cases where a public employer's selection test is being challenged, however, most courts, in finding a prima facie case has been established, have relied on more than a comparison of population and employment statistics. Usually there has been reliable statistical evidence on the percentage of minorities who pass the exam in question as compared with the percentage of whites who pass the same exam. A significant disparity between such statistics showing that minorities pass at a lower ratio than whites has been held to establish a prima facie case that the exam is discriminatory. See Bridgeport Guardians, Inc. et al. v. Members of Bridgeport Civil Service Comm. et al., 482 F.2d 1333, 1335–1336 (2nd Cir., 1973); Castro v. Beecher, 459 F.2d, at 729; Chance v. Board of Examiners, 458 F.2d 1167, 1171 (2nd Cir., 1972); Pennsylvania v. O'Neill, 348 F. Supp. 1084, 1089–1090 (E.D.Pa., 1972). Often the Courts have supported these statistics by referring to a comparison of population and employment statistics, [Bridgeport Guardians, *supra,* at 1335 of 482 F.2d; Castro v. Beecher, 334 F. Supp., at 935–936.] and a few courts have appeared to rely almost exclusively on the latter type of statistical comparison. See Carter v. Gallagher, *3 E.P.D. ¶ 8205 (1971), aff'd. 452 F.2d 315, 323 (8th Cir., 1971); Fowler v. Schwarzwalder, 351 F.Supp. 721 (D.D.Minn., 1972); Western Addition Community Organization v. Alioto, 330 F.Supp. 536, 539 (N.D.Cal., 1971).

■ As noted previously, applicants taking the August 1971 exam were given the option of identifying their race, color or national origin. Some 84% responded and statistics were compiled as a result thereof. Of the 15 persons who

* Employment Practices Decisions.

identified themselves as Negroid, eight passed for a figure of approximately 54%. Of the 3,089 applicants identified as Caucasion, 1737 or approximately 56% passed. Eighteen applicants identified themselves as blacks with eight passing or approximately 44.5%, as opposed to a 55% passing rate for those identified as white. Fifteen identified themselves as of Spanish origin. Five passed for a 33.3% passing rate. The combined black and Spanish-origin passing rate was 39%. Plaintiffs suggest these statistics are sufficient to establish a prima facie case that the exam discriminates against blacks and Spanish-surnamed persons. The Court is not impressed by such obviously meager statistics although it does recognize that some courts have indeed relied on such unconvincing statistics. The District Court in Carter v. Gallagher, 3 E.P.D. ¶ 8205 (1971), based a prima facie finding of discrimination on statistics which showed that over a 20-year period 22 blacks took the exam and 6 passed for a 27.27 percentage. In Fowler v. Schwarzwalder, 348 F.Supp. 844, 846 (D.D. Minn., 1972), the Court noted that while 19 out of 26 minorities passed the exam, 202 of 318 whites passed. In later proceedings the Court neglected this statistic and found that a prima facie case was established on the basis of a comparison between population figures and employee figures. 351 F.Supp. 723, 724 (1972).

This Court does not find the available exam statistics sufficient in themselves to establish a prima facie showing that the exam is discriminatory. A comparison of population and employment statistics, however, is much more telling. Boston has a black population of approximately 16%. The combined minority population may exceed 23%. [See *Associated General Contractors, supra.*] The city has a fire force of approximately 1,983 men. Of that total there are 16 blacks and 2 Spanish-surnamed persons who represent approximately 0.9% of the total force. The City of Springfield has a black population of approximately

13%. Of 475 firefighters in that city, one is black and none are Spanish-surnamed. The one black represents 0.2% of the total force. The City of Cambridge has a black population of 6.1%, and a fire fighting force of 305 men, four of whom are black; one is Spanish-surnamed. They represent approximately 2% of the total force. New Bedford has a black population of approximately 3.5%. Minorities represent approximately 1% of the fire force. Worcester has a black population of approximately 2%. Minorities represent 1% of the fire force there.

■ These statistics, especially for the Cities of Boston and Springfield, are most significant. The Court uses them in support of the meager exam statistics and finds that plaintiffs have established a prima facie case that the Fire Fighter Entrance Examination (FFEE) has a discriminatory effect on blacks and Spanish-surnamed persons. As noted in Vulcan Society v. Civil Service Commission, 490 F.2d 387 (2nd Cir. 1973), such a finding is not determinative of the issue but merely shifts the burden to the defendant to justify the use of the exam. This is a burden a public employer should not be unwilling to assume.

### Validation

■■ The burden has shifted to the defendants to prove a "manifest relationship" between the exam and the job. [Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).] In Castro v. Beecher, *supra*, at 459 F.2d 732, the Court of Appeals stated that where the suspect classification (here the FFEE) is shown to have a racially discriminatory impact, the employer must show that the exam is in fact "substantially related" to job performance by coming forward with "convincing facts" establishing a fit between the qualifications and the job. Defendants' expert Costa testified that the employer cannot operate from some expert point of view that the tests are doing what they are supposed to do. It was his

opinion that the courts and professional psychological standards always require that empirical evidence be obtained. [Tr. 3–22.] The Court agrees.

Where it has been determined that an exam is suspect, the courts have required that a "fit" between the exam and job performance must be established by a study conducted according to professionally accepted standards. The Equal Employment Opportunity Commission Guidelines on Employee Selection Procedures, 29 C.F.R. 1607, et seq., suggest minimum standards for test validity and establish guides to be used in determining the validity of employment tests. "Courts confronted with challenges to public employment examinations predicated upon the equal protection clause of the Fourteenth Amendment have generally agreed that the Guidelines issued by the EEOC provide persuasive standards for evaluating claims of job-relatedness." [Vulcan Society v. Civil Service Commission, 360 F.Supp. 1265, 1273, n. 23 (S.D.N.Y., 1973). See also Western Addition Community Organization v. Alioto, 340 F. Supp. 1351 (N.D.Cal., 1972), and cases cited in n.3 of 1354.] And as was noted in Officers for Justice v. San Francisco, 371 F.Supp. 1328 (N.D. of Cal., 1973), at p. 1337, these Guidelines may indeed have the force of law in cases brought under Title VII of the Civil Rights Act of 1964. See *Griggs, supra,* at 433, of 401 U.S., at 854 of 91 S.Ct. where the Court stated:

> "The Equal Employment Opportunity Commission, having enforcement responsibility, has issued guidelines interpreting § 703(h) to permit only the use of job-related tests. The administrative interpretation of the Act by the enforcing agency is entitled to great deference. . . . Since the Act and its legislative history support the Commission's construction, this affords good reason to treat the guidelines as expressing the will of Congress."

The Civil Service defendants apparently anticipated their burden and during the pendency of these matters caused a validity study to be undertaken by Dr. Costa, who has been retained as the principal psychological testing consultant to the MDCS and was qualified by the Court to testify as an expert witness on employment testing practices. Some brief remarks about validity study procedures in general may be beneficial at this point.

There are two types of test validation studies recognized by the EEOC Guidelines. The Court will borrow from Judge Weinfeld's clear and concise descriptions of these studies in *Vulcan Society, supra,* 360 F.Supp. 1265, 1273 (1973).

> "The preferred method of test validation is criterion-related or empirical validity, which includes what are referred to as the predictive and concurrent methods of validation. Predictive validation consists of a comparison between the examination scores and the subsequent job performance of those applicants who are hired. If there is a sufficient correlation between test scores and job performance, the examination is considered to be a valid or job-related one. Concurrent validation requires the administration of the examination to a group of current employees and a comparison between their relative scores and relative performance on the job."

Predictive validation is preferred where feasible over concurrent validation. A method less preferable than criterion related validity is known as "content validity." Again borrowing from Judge Weinfeld in *Vulcan, supra,* at p. 1274:

> "Content validation is less preferable than the criterion-related methods of test validation but nevertheless a professionally accepted means of establishing job-relatedness where the more desirable empirical methods are impractical. [See EEOC Guidelines, 29 C.F.R. § 1607.5(a).] An examination has content validity if the content of the examination matches the content of the job. For a test to be con-

tent valid, the aptitudes and skills required for successful examination performance must be those aptitudes and skills required for successful job performance. It is essential that the examination test these attributes both in proportion to their relative importance on the job and at the level of difficulty demanded by the job."

For either type of study, it is important that a careful job analysis be undertaken. The criteria used for an empirical validation study should be important criteria selected on the basis of a thorough job analysis. Likewise, a thorough knowledge of the job to be tested is necessary when constructing a content valid examination. "A job analysis is a thorough survey of the relative importance of the various skills involved in the job in question and the degree of competency required in regard to each skill. It is conducted by interviewing workers, supervisors and administrators; consulting training manuals; and closely observing the actual performance of the job." *Vulcan supra*, at 1274.

Dr. Costa conducted what he described as a concurrent criteria-related validity study. A brief discussion of terms as described to the Court is in order. The mathematical relationship between the test scores and the measures of job performance is referred to as the correlation coefficient. A correlation coefficient of .00 means the study shows no relationship between the test and job performance, while a coefficient of 1.00 indicates a perfect relationship between the two. In order for a correlation coefficient to have significance, it must be both statistically and practically significant. Statistical significance means that the possibility of the results being reached by chance are minimal. Practical significance means that the coefficient shows a sufficiently high relationship between success on the test and successful job performance. Both Dr. Costa and plaintiffs' expert, Dr. Hunt, agreed that as a "rule of thumb" a coefficient of .3 would be the minimum level to indicate a satisfactory relationship.

A lower coefficient would not be practically significant and would not justify use of the test.

Dr. Costa used two groups of subjects in his study. Group I consisted of 88 white Boston firefighters who had been recently appointed to the force from the list established in April 1972 as a result of the August 1971 FFEE. Group II consisted of 134 men who had been firefighters for approximately two years. The study implemented two "Performance Appraisal Systems." System I tested for job relatedness between the MDCS job predictors; i. e. exam score, training and experience, and the final score (general average mark), and the performance of 13 tasks considered by both experts to be important criteria of the job. The criteria consisted of such tasks as ladder extension, handling a pre-connected hose (both team-type performances consisting of nine sub-tasks with each man being tested at each sub-task), and such individual performances as air mask operation, extinguisher selection, securing lines and knots, and hose and hydrant operation. Only Group I was tested in Appraisal System I. The study was not done under actual firefighting conditions, but was conducted at the Boston Fire Department's training camp on Moon Island. Appraisal System II consisted of ratings of job performance obtained from company captains and lieutenants collected under actual firefighting conditions. The men were rated on twelve separate scales including understanding buildings, constructions, and fire behavior; mechanical ability; holding up under pressure and stress; carrying out orders; and overall job effectiveness. Both Groups I and II were rated in System II.

System II did not reveal any significant correlations between the two test criteria used (written exam score and general average mark) and successful job performance in either group tested. Dr. Costa admitted that if the results of System II were all that he had available upon which to base a conclusion, he would conclude that the exam was not a

valid predictor of successful job performance. (Tr. 4–22, 23.)

Dr. Costa concluded that System I revealed seven significant correlations. In three of these, however, the predictor was the general average mark score. Since this score is a composite of the written exam score and the training and experience score, its utility in establishing the validity of the exam itself seems questionable. In addition, two of the significant correlations are based on a comparison of the number of errors made on the four best predicted criteria and the written test score. Frankly, the Court has had difficulty understanding the significance of these correlations. Plaintiff argues it is merely a restatement of the original thirteen criteria, only two of which have been shown to have a significant correlation with the written exam. This may be so. At any rate, the Court does observe that the Air Mask Operation (.346) and the Loop Man Position (.313) are the only two job tasks which show a significant relationship with the written exam score, and Dr. Hunt described these correlations as being barely significant. (Tr. 4–141.)

Experts have interpreted the EEOC Guidelines to require that at least one relevant criterion be both statistically and practically significant. 29 C.F.R. § 1607.5(c)(1). Dr. Hunt testified that if one significant correlation is to be accepted as evidence that an exam is job related, the one relevant criterion must represent an adequate measure of total job performance factors. If the one criterion only represents a small percentage of the important factors of the job, this should not be considered adequate to support a conclusion of test validity. Although she agreed that the 13 criteria implemented were important, it was Dr. Hunt's opinion that there were only two significant correlations and that those two did not represent an adequate measure of the total factors involved in the job. Based on Dr. Costa's study, she testified that she would not conclude the exam was job related. Dr. Costa is of the opinion that the exam has been shown to be valid according to EEOC Guideline minimum requirements and he has concluded that the exam is a valid predictor of job performance.

The Court has had no little difficulty in examining the testimony of both experts and in interpreting Dr. Costa's study and the results derived therefrom. Nor has the Court relished the thought of determining which expert opinion to accept on a subject about which the Court knows very little. It is easy for a member of the legal profession, however, to understand how two competent professionals can come to different conclusions given the same set of facts. And it appears, as with the law, that the area of psychological testing is not one where elements of preciseness and exactness usually obtain. The EEOC Guidelines, 29 C.F.R. § 1607.5(c)(1), caution that a test should be closely scrutinized when it is valid against only one component of job performance. The Court feels close scrutiny should also be given where the test may be shown to be valid against a few components of job performance where those components represent only a small percentage of the total job. Close scrutiny seems particularly appropriate where the exam was not designed by experts. The evidence indicated that the FFEE was designed by persons with no training in psychological measurement or testing.

The Court has concluded that defendants have not met their burden of demonstrating that the exam is "in fact substantially related to job performance." See *Castro, supra,* 459 F.2d at 732. Arguably, the test has been validated according to the EEOC Guidelines' minimum standard. However, the Court cannot conclude that the study provides the *"convincing* facts establishing a fit between the qualification and the job," which *Castro, supra,* requires. The fact that only two, or perhaps four, significant correlations were found between the exam and components of job performance—components which represent only a fraction of those duties a fire-

fighter encounters—and the fact that those correlations were only minimally significant does not constitute "convincing" evidence of job relatedness. There was also some criticism of the way in which the study was conducted, but the Court does not feel such criticism warrants discussion in light of this determination.

The Court does not wish to imply that it is establishing standards apart from those embodied in the EEOC Guidelines. However, these Guidelines must be read in the context of certain precedent binding upon this Court (*Griggs, supra; Castro, supra*) which clearly implies that facial compliance with the minimum standards may not be sufficient to meet the "heavy burden" which falls upon a public employer when required to prove the validity of a selection examination which has an adverse racial impact.

### Recruitment

The parties did not agree to treat the hearing as a trial on the merits as to the recruitment issue. As noted previously, since 1968, M.G.L. c. 31 § 2A has required the Director of Civil Service to establish a recruitment program to fill vacancies in the classified civil service, including positions as firefighter. Apparently, the extent to which the program is operated is dependent upon the amount of funds received through appropriations of the Massachusetts legislature. Prior to 1968, it appears that the only statutory duty was to send posters to the city and town halls throughout the Commonwealth, advising the public of available positions and any up-coming exam.

Although there does not appear to be any statutory duty to recruit on the part of the Boston Fire Department, Commissioner Kelly testified at the taking of his deposition that, as Commissioner, he has direct responsibility for recruiting for the Department. However, he has delegated that job to the officer in charge of the Community Relations Division of the Department and despite the Commissioner's ultimate responsibility,

he expressed very little knowledge of what actual efforts have been made in the area of recruiting.

■ Based on a comparison of the population statistics and minority employment statistics referred to earlier, plaintiffs have made a threshold showing of discrimination in the recruitment policies of the MDCS and of the Boston Fire Department. Defendants have presented some evidence attempting to rebut that inference.

In November of 1971, Barton Graham was employed as Assistant Supervisor of Recruitment for the Division of Civil Service. He testified that the present emphasis of the recruiting effort is in the area of minority recruiting for the fire service and corrections service. The Division has a mailing list of over 200 minority related organizations which receive any notices of up-coming exams. He and his subordinates have visited organizations and schools, and a year ago in anticipation of an up-coming exam there was advertising over the electronic media. Newspaper advertising has been done. In the City of Springfield, Mr. Graham has worked closely with the Springfield Urban League which has contracted with the Division to recruit minorities in that part of the state. Apparently these efforts have been quite successful judging from some 200-plus applications received from minorities from the Springfield area. The Division has made plans to increase these efforts, including continued advertising over the local electronic media and the use of billboards. There has also apparently been much effort to advertise in the Spanish language and one of Mr. Graham's subordinates has concentrated on recruiting Spanish-surnamed persons. Prior to these recent efforts, it appears the Civil Service did little more than what was required of them by state law, that is sending posters to city and town clerks.

In light of the lack of any pre-1968 statutory duty to recruit, the lack of any evidence indicating the Division of Civil Service ever did, in fact, engage in any

policy of positive recruitment until recently, and the evidence presented by Civil Service defendants as to current recruitment activities, the Court feels the defendants have come very close to rebutting any inference they discriminated in their recruitment policies. In fact, they had no policy in the past other than the statutory requirement. Even if there had been an implied duty or a necessity to recruit and interest persons in joining the fire force, such an obligation would most logically have fallen upon the city or town in need of firemen and not the Civil Service.

The Court finds that it is not probable plaintiffs will succeed on the merits as to the issue of alleged discriminatory recruitment policies on the part of the Civil Service defendants, and preliminary relief is therefore denied. Practically speaking, this determination has little effect as the Court will require, as part of its order, an affirmative recuitment policy to help remedy the present effects of past discrimination on the part of the Civil Service— that discrimination being, the requirement that applicants pass a non-job related examination which has an adverse racial impact on blacks and Spanish-surnamed persons.

The City of Boston also presented evidence attempting to rebut the inference that they have engaged in discriminatory recruitment policies. In 1968, two black Boston firefighters spent one day in Boston's predominantly black neighborhood passing out literature and trying to promote interest in the fire department. One of the men, Robert Powell, testified they approached from 80 to 100 people who indicated interest. The people were told of a training program which would be held to help prepare minority applicants for the FFEE. Such a program was held. It was open to all applicants and few blacks actually attended. There was no evidence indicating what, if any, type of recruiting was done between 1968 and 1972, although the training courses did continue in those years. In 1972, the fire department accelerated somewhat its minority recruitment program. Two black firefighters testified that for a period of weeks they talked to organizations, at high schools and to people on the street trying to promote interest among blacks in the fire department. Each of them had also at different times been sent out of state, at the department's expense, to conferences of black firefighters where recruitment efforts and techniques were apparently discussed. A Spanish-surnamed firefighter testified that he spent approximately two weeks in 1972 doing full-time recruitment work in the predominantly Spanish-speaking neighborhood of Boston. He passed out leaflets and arranged for announcements to be made over a Spanish radio program. About 100 people indicated an interest but he recalls only approximately 30 showed up for the first training class and that number rapidly dwindled.

All witnesses who were asked agreed that the greatest source of new applicants for the fire department is word of mouth and encouragement from friends and relatives already on the force. This was recognized as being true in the police department by Judge Wyzanski in his order approving the consent decree in Castro v. Beecher, 365 F.Supp. 655 (D. Mass., 1973), at 659. This Court is of the opinion that the fire department itself is the entity more closely concerned with getting people to fill vacant positions on the force. If indeed, for so many years those positions have been filled as the result of white firemen encouraging white friends and relatives to join the force, it is no little wonder that blacks and Spanish-surnamed persons represent such an insignificant percentage of the force. It is of course most understandable how this has happened and the Court wishes to make it clear that it is not suggesting such an exclusionary policy has been followed intentionally or by design. Such a finding is not essential for the granting of injunctive relief. [See *Griggs, supra.*] Where, however, the policy has in effect resulted in the exclusion of mi-

norities from the fire department, the policy must be changed and present effects of past discrimination must be remedied.

■ From these facts the Court has determined that plaintiffs will suffer irreparable harm in the nature of a lack of equal opportunity to compete for jobs on the Boston Fire Department, that the granting of preliminary relief will not cause irreparable harm to the defendants, that plaintiffs are likely to succeed on the merits, and that the public has an interest in being served by a fire department which offers equal opportunity for employment to all of its citizens.

### Relief

There is a substantial body of case law allowing, and in some instances requiring, affirmative relief to remedy the present effects of past discrimination. "We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1964). See also *Associated General Contractors, supra,* and cases cited therein at 361 F.Supp. 1303–1307. Affirmative relief has been granted, in particular, in a number of cases where discriminatory hiring practices have been found in municipal police and fire department hiring policies. See Vulcan Society v. Civil Service Commission, supra, 490 F.2d 387 (Nov. 21, 2nd Cir., 1973); Bridgeport Guardians, *supra;* Commonwealth v. O'Neill, 473 F.2d 1029 (3rd Cir., 1973); Castro v. Beecher, *supra,* at 459 F.2d 725; Carter v. Gallagher, *supra;* Officers for Justice, *supra;* Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187 (D. Md., 1973).

The Court is vested with broad discretionary power in shaping equity decrees. "Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable.

'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.' [Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).]" Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1972). In framing its relief this Court has attempted to "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding [that] those interests have constitutional roots." *Lemon, supra,* at 201, 93 S.Ct., at 1469. Among other things, the Court has considered the importance of preserving morale within the fire departments and avoiding racial discord. It has considered the understandable anxiety of men currently on existing Civil Service eligibility lists and is concerned that they not be dealt with unfairly. It is concerned with the future of plaintiffs who have been discriminated against, though it be unintentional, and who seek an equal opportunity to compete for positions on the fire departments throughout the Commonwealth. And it is concerned with the public which deserves to have a full complement of qualified firefighters protecting the cities and towns of the Commonwealth.

The Court has studied the proposed decrees submitted by the parties and has studied and adopted some thoughts from the final consent decree entered in Castro v. Beecher, *supra.* The Court would like to add that the following decree is subject to amendment where the parties so agree and with the approval of the Court.

### Decree

This case having come before the Court for a hearing on plaintiffs' motion for preliminary injunction and the parties having agreed pursuant to Federal Rule of Civil Procedure 65(a)(2) that the evidence presented on the testing issues should be considered as the

evidence on the trial on the merits, and the Court having heard the testimony of the witnesses and the oral arguments of the parties for approximately five and one-half trial days, and the Court having considered the oral and documentary evidence presented, the briefs and arguments of counsel, and having made findings of fact and conclusions of law, and being of the opinion that a decree should be entered; it is hereby ordered, adjudged and decreed:

1. The defendants City of Boston and Massachusetts Division of Civil Service and their officials, agents, employees, and all persons in active concert or participation with them are enjoined from engaging in any act or practice which has the purpose or effect of discriminating against any applicant or potential applicant for employment with the Boston Fire Department or any other fire department in the Commonwealth subject to Civil Service law.

2. No further certifications of permanent appointments shall be made to the position of firefighter for the City of Boston or other cities and towns subject to Civil Service law on the basis of the list completed from the August 1971 firefighter examination unless done in compliance with the terms of this decree.

3. The City of Boston and any other city or town subject to Civil Service law may request Civil Service for immediate certification of candidates who are currently on the existing Civil Service eligibility list to fill, on a provisional basis, existing vacancies or vacancies which may arise prior to full compliance with this decree. The Court further orders that the life of said list shall, if necessary, be extended beyond the time of its expiration under Massachusetts law and until a new eligibility list is established in accordance with this decree. Should the existing list prove insufficient to fill the number of vacancies existing, the cities or towns subject to Civil Service law may hire firefighters on a provisional basis. The method of selection shall be left to defendants' discretion.

4. The Massachusetts Division of Civil Service shall cease using written firefighter entrance examinations of the type administered by the Division of Civil Service in August 1971, for the purpose of determining qualifications for the selection of firefighters. Should the Division of Civil Service desire to utilize entrance examinations in the future for the purpose of selecting firefighters, such examinations shall be demonstrably job-related and validated in accordance with the "Guidelines on Employees Selection Procedures" issued by the Equal Employment Opportunity Commission, 29 C.F.R. § 1607.1 et seq., or otherwise shown to have no discriminatory impact. If the parties disagree as to whether a written examination has been shown to be valid within the meaning of the Guidelines, the question of their validity and job relatedness shall be resolved by the Court, and such resolution, whether by the parties' agreement or by the Court, shall be accomplished before any such test is put into use for the purpose of qualifying or selecting. As with the instant study, the Court will scrutinize closely a future study which shows only a minimal level of job-relatedness.

5. Defendant City of Boston is preliminarily enjoined from requesting certifications of appointments for permanent positions on the fire department unless the following conditions have been complied with. Whenever openings occur in any positions covered by this Decree warranting the giving of an examination, the defendant City of Boston shall contact organizations in the black and Spanish-surnamed communities and high schools and junior colleges with substantial black and Spanish-surnamed enrollments and shall provide them with information regarding such openings, including qualifications and selection procedures, the rates of pay and hours of work and the time, place and method of applying for such vacancies.

6. At least 45 days prior to any examination for firefighter, the defend-

ants City of Boston and Division of Civil Service shall engage in such personal recruiting efforts and such public service and other announcements on radio and television stations and in other media directed at the black and Spanish-surnamed communities as are reasonably necessary in order to provide enough qualified black and Spanish-surnamed American applicants to achieve the goals set forth in this decree.

■ 7. Subsequent to obtaining the results of a valid examination, the defendant Director of the Massachusetts Division of Civil Service, the defendants Massachusetts Civil Service Commissioners and their successors in office, shall promptly commence certifying firefighter applicants as eligible for appointment for each fire department subject to Civil Service. For each fire department a pool of eligible firefighter candidates shall be established and candidates certified in the following manner:

(a) Group A shall consist of all black and Spanish-surnamed applicants who failed any previous Fire Fighter Entrance Examination but passed the new valid examination and are otherwise qualified for appointment on the basis of existing requirements. Said candidates shall be ranked in accordance with existing Massachusetts law.

(b) Group B shall consist of all persons on the current eligibility list established on April 4, 1972. Said candidates shall be ranked in accordance with existing Massachusetts law except that any such persons who have been appointed to a fire department from said list on a provisional basis shall be listed first.

(c) Group C shall consist of all black and Spanish-surnamed persons, excluding those in Group A who shall pass the new valid examination and are otherwise qualified for appointment on the basis of existing requirements. Said can-

didates shall be ranked in accordance with existing Massachusetts law.

(d) Group D shall consist of all other persons, excluding those in Groups A, B and C, who pass the new valid examination and are otherwise qualified for appointment on the basis of existing requirements. Said persons shall be ranked in accordance with existing Massachusetts law.

8. In response to requisitions submitted by fire departments, candidates shall be certified to such departments on the basis of one candidate from Group A for every candidate certified from Group B until the list of candidates from Group A is exhausted.

9. Upon the exhaustion of Group A, candidates shall be certified to requisitioning fire departments on the following basis:

(a) For the Cities of Boston and Springfield, one candidate from Group C for each candidate certified from Group B.

(b) For all other cities and towns, one candidate from Group C for every 3 candidates certified from Group B, until the candidates from Groups B and C are exhausted.

(c) If Group B is exhausted prior to Group C, candidates will be certified from Group D in accordance with the ratio established for Group B in paragraphs 8 and 9.

10. Should a candidate qualify to be placed in Groups A, B or C, after exhaustion of the Group for which he is eligible, said Group will be revived for purposes of affording the candidate the position he would have enjoyed.

11. Upon the exhaustion of Groups A, B and C, candidates shall be certified from Group D. Groups C and D shall expire in accordance with Massachusetts law.

12. The above hiring procedure shall apply to all future eligibility lists established subsequent to a valid firefighter

entrance examination, and shall apply to all cities and towns subject to Civil Service law which have a minority population of 1% or more. Any new list established after the exhaustion of the list described herein shall include a Group of all eligible blacks and Spanish-surnamed persons (as in Group C) and a Group of all other eligible persons (as in Group D). Candidates shall be certified from each Group in accordance with the ratio established in paragraph 9. As a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, certifications will be made according to existing Massachusetts law.

13. At this time, the Court will make no specific order as to record-keeping or reporting on the part of the defendants. The Court will give the parties 30 days in which to attempt to reach a satisfactory agreement on those issues. The Court would expect the parties to bear in mind such considerations as the administrative burden to the defendants and the necessity of monitoring the implementation of this decree. If, at the expiration of the 30 days, the parties cannot agree on a satisfactory system, the Court will take appropriate action.

14. Plaintiffs' requests for damages and attorneys' fees are denied.

15. The Court shall retain jurisdiction for such further action as may be necessary or appropriate.

### Addendum

It has come to the Court's attention that the defendant Civil Service has scheduled an examination for February 23, 1974. The Court regrets the effect this decision will have on efforts that have been made to inform candidates and prepare them for that examination. However, the defendants knew well during the pendency of this action that a determination adverse to them would most likely result in the Court's refusal to allow such an exam to go forward. The Court is also aware that defendants are making efforts to improve the exam and continue meaningful recruitment policies. Hopefully, such efforts will continue and, in the future, result in a satisfactorily validated exam with a significant number of black and Spanish-surnamed applicants competing.